UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------

CARLA OTTLEY-COUSIN,

                Plaintiff,                  **MEMORANDUM & ORDER**
                                             16-CV-00577 (MKB)

                v.

MMC HOLDINGS, INC.,

                Defendant.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Carla Ottley-Cousin commenced the above-captioned action on February 3, 2016 against her former employer, Defendant MMC Holdings, Inc. ("MMC"), alleging race discrimination and retaliation in violation of 42 U.S.C § 1981, retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and race discrimination, retaliation, and disability discrimination in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"). (Compl., Docket Entry No. 1.) Plaintiff alleges that Defendant demoted her and then ultimately terminated her because of her race, disability, use of FMLA leave, and complaints of discrimination. (*Id.* ¶ 1.)

      Currently before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Def. Mot. for Summ. J. ("Def. Mot."), Docket Entry No. 47; Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 51.) By Order dated March 31, 2019, the Court granted in part and denied in part Defendant's motion for summary judgment (the "March 2019 Decision"). (Mar. 2019 Decision, Docket Entry No. 61.) The Court granted Defendant's motion as to Plaintiff's race discrimination and retaliation claims

under section 1981, denied Defendant's motion as to Plaintiff's FMLA retaliation claim, and reserved decision on Plaintiff's NYCHRL claims. (*Id.* at 2.) By this Memorandum and Order, the Court grants Defendant's motion as to Plaintiff's NYCHRL claims and explains the reasons for the March 2019 Decision.

## I. Background

### a. Plaintiff's employment

Plaintiff, who identifies as African-American and Hispanic, was hired by Defendant in May of 2000. (Def. L. R. 56.1 Stmt. of Undisputed Material Facts ("Def. 56.1") ¶¶ 1, 23, Docket Entry No. 48; Pl. Resp. to Def. 56.1 ("Pl. Resp. 56.1") ¶¶ 1, 23, Docket Entry No. 52.) Plaintiff was hired as a Customer Service Representative to work for Executive Physician Systems, Inc., a physician billing company and a subsidiary of Defendant. (Def. 56.1 ¶¶ 4–5, 23; Pl. Resp. 56.1 ¶¶ 4–5, 23.) In that role, Plaintiff "would answer the [tele]phone and speak with insurance companies, patients, and doctors' offices regarding the payment of medical bills." (Def. 56.1 ¶ 25; Pl. Resp. 56.1 ¶ 25.)

Beginning in approximately 2001, Plaintiff reported to an individual named Phyllis Matera. (Def. 56.1 ¶ 9; Pl. Resp. 56.1 ¶ 9.) As Plaintiff's supervisor, Matera evaluated Plaintiff's performance and "always" gave her good performance reviews. (Def. 56.1 ¶¶ 31–33; Pl. Resp. 56.1 ¶¶ 31–33.) In 2003, at Matera's suggestion, Plaintiff was promoted to supervisor of the Customer Service Department. (Def. 56.1 ¶¶ 28, 45; Pl. Resp. 56.1 ¶¶ 28, 45.) In 2010, Matera herself was promoted, and Cindy Albertson replaced Matera as Plaintiff's supervisor. (Def. 56.1 ¶¶ 58–59; Pl. Resp. 56.1 ¶¶ 58–59.)

In January of 2014, Plaintiff met with Maryann Ferrari, the Executive Director of MMC. (Def. 56.1 ¶¶ 6, 62; Pl. Resp. 56.1 ¶¶ 6, 62.) During this meeting, Plaintiff told Ferrari that

Matera was "difficult to work with," but that Plaintiff was "able to get along with [her]," and complained that her new supervisor, Albertson, "speaks differently" to Plaintiff. (Def. 56.1 ¶¶ 63, 64; Pl. Resp. 56.1 ¶¶ 63, 64.) At her deposition, Plaintiff testified that she told Ferrari that Albertson was "constantly belittling [Plaintiff] and speaking down to [her] in front of staff [and] in [Albertson's] office." (Dep. of Carla Ottley-Cousin ("Pl. Dep.") 380:22–25, annexed to Decl. of Walker G. Harman, Jr. ("Harman Decl.") as Ex. 3.2, Docket Entry No. 55-4.) Ferrari responded that Albertson is "a little bit harsh with people" and gave Plaintiff "pointers" on "how to deal with [Albertson]." (*Id.* at 381:15–382:22.) Plaintiff told Ferrari that Albertson was "much harsher with [Plaintiff]." (*Id.* at 382:24–25.)

After implementing some of Ferrari's "pointers," Plaintiff called Ferrari and "told her that things hadn't changed." (*Id.* at 385:19–22.) In response, Ferrari "said that she wanted to speak with David Vandergast," the Director of MMC, "so that they both could sit with [Plaintiff] and talk with [her]." (*Id.* at 385:22–386:4.) Plaintiff subsequently met with Ferrari and Vandergast and complained that Albertson "picked on" Plaintiff and "spoke[] to [her] differently" and that Matera "constantly [had] something to say to [Plaintiff]," even though she was no longer Plaintiff's supervisor. (Def. 56.1 ¶ 71; Pl. Resp. 56.1 ¶ 71.) For example, Plaintiff reported to Ferrari and Vandergast that "in the wintertime, [employees would] come in with winter boots . . . [and then change into business shoes]," and that Matera would reprimand Plaintiff for her improper footwear before she had a chance to change into business shoes. (Pl. Dep. 407:5–408:6.)

Plaintiff did not indicate at either meeting that she believed she was being picked on because of her race.

### b. Plaintiff's first FMLA leave

On September 22, 2014, Plaintiff submitted a request for FMLA leave to care for her son, and was granted leave from October 3, 2014 to October 17, 2014. (Def. 56.1 ¶¶ 73–75; Pl. Resp. 56.1 ¶¶ 73–75.) On or about October 17, 2014, Plaintiff contacted Defendant's Human Resources Department and requested additional time off. (Def. 56.1 ¶ 77; Pl. Resp. 56.1 ¶ 77.) Defendant subsequently extended Plaintiff's FMLA leave until December 17, 2014. (Decl. of Carla Ottley-Cousin ("Pl. Decl.") ¶ 49, Docket Entry No. 54; Def. 56.1 ¶ 78; Pl. Resp. 56.1 ¶ 78.) However, Plaintiff did not return to work on December 17, 2014. (Def. 56.1 ¶ 79; Pl. Resp. 56.1 ¶ 79.)

Plaintiff testified that at some point during her leave, she spoke with Susan Zhou, who worked in Defendant's Human Resources Department. (Pl. Dep. 563:10–13.) Zhou told Plaintiff that she could not return to work unless she was "cleared" by a doctor and that Zhou "needed a note from [a] doctor." (*Id.* at 563:10–13.) In January of 2015, Zhou called Plaintiff and "told [her] that the three-month period would be up [soon]," and that Zhou "needed the release letter from the doctor or [Plaintiff] wouldn't be able to come back." (*Id.* at 566:9–13.) Zhou also instructed Plaintiff to "let [Albertson] know that [Plaintiff would] be coming back to work." (*Id.* at 566:15–21.) When Plaintiff called Albertson as instructed, Albertson said, "[f]rom what I understand, you no longer work for this company." (*Id.* at 567:15–20.) Plaintiff then spoke with Ferrari and told her that Albertson "told [Plaintiff] that she was terminated." (*Id.* at 571:23–572:8.) Ferrari responded that "no one had told her anything about that," and that Albertson "did not want [Plaintiff] back because [she] did not reach out to [Albertson] and tell her that [she] was sick." (*Id.* at 572:9–13, 573:7–11.)

### c. Elimination of Plaintiff's position and Plaintiff's reassignment

On October 28, 2014, Ferrari emailed Albertson and Vandergast informing them that Plaintiff had "submitted paperwork for disability for a month period." (Oct. 2014 Email, annexed to Harman Decl. as Ex. 14, Docket Entry No. 55-16.) Ferrari told them to seek a temporary employee to replace Plaintiff. (*Id.*) Ferrari then wrote to Albertson, "[y]ou do have a temp[orary] [employee] in place for this, correct? If not, get one." (*Id.*) Albertson responded, "[n]ow it is a disability? For one month . . . what happened to the two then three months . . . unreal." (*Id.*)

On January 21, 2015, Albertson wrote an email to another employee stating that Plaintiff "should have been back on January 3," 2015, and that the Customer Service Department "ha[d] been running like clock-work and . . . [Albertson] really [did not] want [Plaintiff] back." (Jan. 2015 Email, annexed to Harman Decl. as Ex. 15, Docket Entry No. 55-17.) In addition, Albertson wrote, "I don't know what can be done, but my recommendation is that [Plaintiff] is let go for abandonment of her position." (*Id.*)

In a sworn declaration, Ferrari states that during Plaintiff's leave, the Customer Service Department "was functioning without a supervisor," and Albertson and Vandergast told Ferrari that "the [s]upervisor position was no longer needed." (Decl. of Maryann Ferrari ("Ferrari Decl.") ¶¶ 10–11, Docket Entry No. 50.) Vandergast conferred with Ferrari, "and they decided that the [s]upervisor position was unnecessary and could be eliminated due to budgetary reasons." (Def. 56.1 ¶ 84; Pl. Resp. 56.1 ¶ 84.) The parties do not state when Defendant decided to eliminate Plaintiff's former position.

Ferrari "did not want [Plaintiff] to be terminated," so she reassigned Plaintiff to the Accounts Receivable Department as an analyst. (Def. 56.1 ¶¶ 85–86; Pl. Resp. 56.1 ¶¶ 85–86.)

Plaintiff's salary and hours remained the same, even though Plaintiff's salary was higher than that ordinarily paid to analysts. (Def. 56.1 ¶¶ 87–88, 96–97; Pl. Resp. 56.1 ¶¶ 87–88, 96–97.) Plaintiff's direct supervisor in her new department was Gail Cortez, who in turn reported to Matera. (Def. 56.1 ¶¶ 94–95; Pl. Resp. 56.1 ¶¶ 94–95.)

### d. Plaintiff's return to work after FMLA leave

On February 17, 2015, Plaintiff returned to work in her new role as an analyst. (Def. 56.1 ¶ 91; Pl. Resp. 56.1 ¶ 91.) As an analyst, "Plaintiff's new duties were, among other things, to be responsible for collecting balances on accounts from third party carriers, including insurance carriers." (Def. 56.1 ¶ 93; Pl. Resp. 56.1 ¶ 93.) Plaintiff underwent training in her new department. (Def. 56.1 ¶ 99; Pl. Resp. 56.1 ¶ 99.) In Plaintiff's former position, she had supervisory authority over a staff of approximately three people, but in her new position as an analyst, Plaintiff had no supervisory authority. (Pl. L. R. 56.1 Stmt. of Undisputed Material Facts ("Pl. 56.1") ¶¶ 1–2, Docket Entry No. 52.)

When she returned to work, Plaintiff was "very concerned about her career," in part because she "had previously been on an upward track," but the transfer was a "step back" in her career that made her "seriously doubt whether [she] would be able to ever advance at MMC." (Pl. Decl. ¶ 58.) On the same day that Plaintiff returned to work, another employee told Plaintiff to "be careful" because "the next step for [her] at MMC would be 'out the door.'" (*Id.* ¶ 60.) Also on that day, Plaintiff attempted to contact Pamela Brier, the President of MMC. (Def. 56.1 ¶¶ 112–13; Pl. Resp. 56.1 ¶¶ 112–13.) Plaintiff left a message with Brier's secretary, which was forwarded to Ferrari. (Def. 56.1 ¶¶ 115, 118; Pl. Resp. 56.1 ¶¶ 115, 118.) However, Ferrari was out of the office on leave at that time. (Def. 56.1 ¶ 106; Pl. Resp. 56.1 ¶ 106.)

On February 18, 2015, the day after Plaintiff returned to work, she emailed Vandergast and asked to speak with him. (Def. 56.1 ¶ 107; Pl. Resp. 56.1 ¶ 107.) Plaintiff wanted to know why she was "demoted," wanted to discuss the complaints that she had lodged against Matera and Albertson, and wanted to know whether the company had plans to fire her. (Def. 56.1 ¶¶ 108–10; Pl. Resp. 56.1 ¶¶ 108–10.)

### e. Plaintiff's meeting with Ferrari and investigation of Plaintiff's complaints against Cortez and Matera

When Ferrari returned from leave in April of 2015, she met with Plaintiff regarding Plaintiff's call to Brier that was forwarded to Ferrari. (Def. 56.1 ¶ 119; Pl. Resp. 56.1 ¶ 119.) During that meeting, Plaintiff complained that she had to hear Cortez "say things all day," including that Cortez had a problem "with Muslim individuals, Jewish individuals, and Puerto Rican individuals." (Def. 56.1 ¶¶ 120–21; Pl. Resp. 56.1 ¶¶ 120–21.) Plaintiff also complained that Matera was "micromanaging [her] work" even though Matera was no longer Plaintiff's supervisor. (Def. 56.1 ¶ 122; Pl. Resp. 56.1 ¶ 122.) Further, Plaintiff reported to Ferrari that she "was told [that she] needed to watch [her] back" and that she was going to be fired. (Pl. Dep. 641:3–8, annexed to Harman Decl. as Ex. 3.3, Docket Entry No. 55-4.) Ferrari arranged approximately fifteen meetings with other employees who had worked with Cortez to investigate Plaintiff's complaints. (Def. 56.1 ¶¶ 125, 126; Pl. Resp. 56.1 ¶¶ 125, 126.)

Plaintiff met with Ferrari again on July 14, 2015, and suggested that Ferrari interview specific individuals, and Ferrari did so. (Def. 56.1 ¶¶ 127–29; Pl. Resp. 56.1 ¶¶ 127–29.) In July and August of 2015, Ferrari also "held a series of group meetings" with employees in the Accounts Receivable Department. (Def. 56.1 ¶ 130; Pl. Resp. 56.1 ¶ 130; Pl. Dep. 661:20–24.) Plaintiff attended these meetings, and many employees complained that they were being "picked on" by Cortez and Matera. (Def. 56.1 ¶ 136; Pl. Resp. 56.1 ¶ 136.) Plaintiff also told Ferrari at

one of the group meetings that she "felt that the black employees were treated differently within the company, especially within [the Accounts Receivable Department]." (Pl. Dep. 665:8–11.) Ferrari's notes from a group meeting on July 15, 2015 state that Geraldine Flannigan said that the "problem we have is how we are approached [and] we are spoken to in a demeaning [manner]," and that an employee named Rosella stated, "I am uncomfortable on how she speaks to other people — Diana feels [the] same way." (Group Meeting Notes, annexed to Decl. of Barbara E. Hoey ("Hoey Decl.") as Ex. HH, Docket Entry No. 49-34.) Ferrari's notes also reflect that an employee named Kim stated that Cortez "constantly speaks to me like I am not intelligent," and Diana stated, "I use[d] to love coming in but things have changed." (*Id.*)

Plaintiff does not identify the race of each of these employees.

### f. Plaintiff's filing with the EEOC

In June of 2015, Plaintiff filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Pl. 56.1 ¶ 3.) On June 30, 2015, Defendant received notice of the charge. (*Id.* ¶ 4.)

### g. Plaintiff's second FMLA leave

In September of 2015, Plaintiff requested FMLA leave. (Def. 56.1 ¶ 152; Pl. Resp. 56.1 ¶ 152.) Plaintiff's request was approved and she was scheduled to return to work on October 13, 2015. (Def. 56.1 ¶ 153; Pl. Resp. 56.1 ¶ 153.) Plaintiff spoke with Zhou twice in September of 2015. (Pl. Dep. 743:9–12.) Zhou called Plaintiff to ask her "what day [she] would be returning," and Plaintiff responded that "the doctor had not released [her to go] back to work." (*Id.* at 743:16–22.) Zhou asked Plaintiff to notify her when Plaintiff received approval to return to work. (*Id.*)

Plaintiff was deemed "totally disabled" by her treating doctor, and therefore could not work in October, November, or December of 2015. (Def. 56.1 ¶ 181; Pl. Resp. 56.1 ¶ 181.) Plaintiff "applied for benefits" and was declared "totally disabled" by Defendant's long-term disability carrier, effective September 11, 2015. (Def. 56.1 ¶ 182; Pl. Resp. 56.1 ¶ 182.)

On or about October 1, 2015, Plaintiff drove to Florida with her two sons and a friend. (Def. 56.1 ¶ 155; Pl. Resp. 56.1 ¶ 155.) After staying in a hotel for one week, Plaintiff and her sons went to live at her mother's house in Fort Lauderdale, Florida, where Plaintiff enrolled her children in school. (Def. 56.1 ¶¶ 156–58; Pl. Resp. 56.1 ¶¶ 156–58.) When Plaintiff enrolled her children in school, she "listed her residence as her mother's address in Florida." (Def. 56.1 ¶ 159; Pl. Resp. 56.1 ¶ 159.)

Plaintiff did not return to work on October 13, 2015 as planned. (Def. 56.1 ¶ 161; Pl. Resp. 56.1 ¶ 161.) Plaintiff states that she "intended to spend the three to six months [that her] doctor had recommended [that she] take off to recuperate in Florida near [her] mother." (Pl. Decl. ¶ 88.)

### h. Plaintiff's termination

In November of 2015, Ferrari spoke with Zhou regarding Plaintiff's absence. (Def. 56.1 ¶ 169; Pl. Resp. 56.1 ¶ 169.) Zhou had not spoken to Plaintiff since September of 2015. (Def. 56.1 ¶ 171; Pl. Resp. 56.1 ¶ 171.) Ferrari directed Zhou to call Plaintiff in order to determine whether Plaintiff planned to return to work. (Def. 56.1 ¶ 172; Pl. Resp. 56.1 ¶ 172.) Zhou "made several [tele]phone calls" to Plaintiff, but was unable to reach her. (Def. 56.1 ¶ 173; Pl. Resp. 56.1 ¶ 173.)

Ferrari subsequently decided to terminate Plaintiff's employment for job abandonment, and directed Zhou to send Plaintiff a letter advising her that MMC considered her to have

abandoned her position at the company.  (Def. 56.1 ¶¶ 174–75; Pl. Resp. 56.1 ¶¶ 174–75.)

Plaintiff received the letter on or about November 30, 2015.  (Def. 56.1 ¶ 176; Pl. Resp. 56.1 ¶ 176.)

### i. Plaintiff's allegations of discrimination

Plaintiff states that while employed by Defendant, she participated in MMC's Diversity Council.  (Pl. Decl. ¶ 13.)  Plaintiff states that the Council's efforts to "address some of the racial issues at MMC" were "somewhat successful," but "often received pushback."  (*Id.* ¶¶ 14, 19.) For example, "people took down flyers and posters that the [Diversity] Council had put up in advance of Black History Month" and Plaintiff "heard complaints that [the] diversity efforts were a waste of time."  (*Id.* ¶¶ 20–21.)

When Plaintiff began reporting to Albertson in 2010, her "work environment got much worse."  (*Id.* ¶ 29.)  She was "very worried about reporting to . . . Albertson" because in March of 2003, when Plaintiff was promoted to supervisor of the Customer Service Department, Matera told Plaintiff that Albertson remarked, "[w]ho's this little black girl with all the power?"  (*Id.* ¶¶ 11, 28.)  Further, in 2008, when Albertson became aware that Plaintiff had "learned of and applied for a promotion open in Accounts Receivable," Albertson "began threatening [Plaintiff] not to take that job, saying that she'd have [Plaintiff] demoted instead."  (*Id.* ¶¶ 23–24.)  Plaintiff was offered the position, but she turned it down because of Albertson's threats.  (*Id.* ¶ 25.)

After Albertson became Plaintiff's supervisor, "Albertson and . . . Matera would constantly monitor [Plaintiff], and [she] would frequently receive emails and [tele]phone calls questioning where [she] was after so much as getting up to use the restroom."  (*Id.* ¶ 31.)  She was also "frequently reprimanded for inconsequential issues, such as the style of shoes [that she] wore," and Albertson excluded Plaintiff from manager-level meetings.  (*Id.* ¶¶ 32, 33.)  In

addition, Plaintiff was once "walking behind [Albertson], and [Albertson] was speaking about [another employee], talking about [that employee] being classless and tacky, and [saying that] Puerto Ricans are classless . . . and tacky." (Pl. Dep. 286:7–11.)

When Plaintiff returned to work from her FMLA leave in February of 2015, she was concerned that Cortez would be her new supervisor because Cortez "is one of the most hostile supervisors at MMC" who "regularly makes all sorts of offensive racist comments." (Pl. Decl. ¶ 61.) For example, Cortez reprimanded another employee "because her grandchildren — who are biracial — came to visit [that employee] at work." (*Id.* ¶ 62.) In addition, Cortez would frequently make "offensive comments about Muslims, Jews, Puerto Ricans, and other groups," (*id.* ¶ 63), by, for example, stating that "she didn't understand why Puerto Ricans were in this country" or why Puerto Ricans "have the same rights as Americans," (Pl. Dep. 648:8–11), and commenting, "we need to get these Muslims out of this country," (*id.* at 648:19–21).

Plaintiff also testified that Cortez would "correct" Plaintiff's work, even though her work did not "actually [contain] mistakes." (*Id.* at 691:10–692:2.) For example, one of Plaintiff's duties was "to send letters out to the insurance companies." (*Id.* at 689:22–23.) Plaintiff's letters were checked and changed, even though she copied the letters from other employees whose work was not checked or changed. (*Id.* at 691:14–692:2.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230

(2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

  **b. Section 1981 race discrimination claim**

  Defendant argues that Plaintiff has not established a prima facie case of race discrimination under section 1981 because she did not suffer any adverse employment action and cannot show an inference of discrimination. (Def. Mem. 4–10.) Defendant also argues that even assuming Plaintiff has established a prima facie case, Plaintiff's claim nevertheless fails because Defendant had a legitimate business reason for her transfer, and Plaintiff cannot show pretext. (*Id.* at 10–12.)

  Plaintiff argues that her race discrimination claim survives summary judgment because she has provided evidence that she suffered three adverse employment actions — harassment, transfer, and termination — and has established an inference of discrimination through evidence of derogatory comments and disparate treatment. (Pl. Opp'n to Def. Mot. ("Pl. Opp'n") 6–12, Docket Entry No. 53.) In addition, Plaintiff argues that she can establish pretext because Albertson made "offensive race-based comments" and "pushed for Plaintiff's termination." (*Id.*

at 13.)

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). As the Second Circuit has explained, section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004)). "The same core substantive standards that apply to claims of discriminatory conduct in violation of Title VII" are applicable to claims of discriminatory conduct in violation of section 1981. *Id*. Section 1981 discrimination claims are therefore analyzed under the three-stage, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Vargas v. Morgan Stanley*, 438 F. App'x 7, 9 (2d Cir. 2011) (analyzing Title VII and section 1981 discrimination claims under the same standard).

Under that framework, "a plaintiff must first establish a prima facie case of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). If the plaintiff meets this "minimal" burden, *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008), a "temporary presumption" of discrimination arises, and the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the challenged conduct, *Vega*, 801 F.3d at 84 (quoting *Littlejohn v. City of New York*, 795 F.3d at 297, 307, 311 (2d Cir. 2015)).

If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff to show that the defendant-employer's reason was pretext for the discrimination. *Id*. at 83.

Defendant does not contest that Plaintiff is a member of a protected class and was qualified for her former position, nor does Defendant contest that Plaintiff's termination was an adverse employment action. Accordingly, the Court examines whether Plaintiff's claims of harassment and transfer are adverse employment actions and determines whether Plaintiff has shown that an inference of discrimination exists as to any adverse employment action.

### i. Adverse employment action

Defendant argues that Plaintiff's "allegations of 'harassment' are based on everyday disagreements with her managers" and therefore do not constitute an adverse employment action. (Def. Mem. 4; *see also id.* at 4–7.) In addition, Defendant argues that Plaintiff's transfer was not an adverse employment action because management decided to eliminate her former position and reassign her to a different role with the same salary and hours. (*Id*. at 7–8.)

Plaintiff argues that she has provided evidence that, in addition to her termination, she suffered two adverse employment actions — (1) "repeated[] . . . race-based discrimination," *i.e.*, harassment, over the course of her career; and (2) transfer from a supervisory position to a non-supervisory position.[1] (Pl. Opp'n 6–7.)

An "adverse employment action" is "a materially adverse change in the terms and conditions of employment." *Shultz v. Congregation Shearlth Israel of City of N.Y.*, 867 F.3d 298, 303 (2d Cir. 2017) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *see also Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 22 (2d Cir. 2015) ("For purposes

---

[1] It is unclear whether Plaintiff is arguing that she suffered an adverse employment action arising out of her harassment, or that harassment "led to" her termination. (Pl. Mem. 7.) The Court construes and evaluates Plaintiff's claim as a separate adverse employment action.

of a Title VII discrimination claim by a person already employed, an adverse employment action is defined in our Circuit as a materially adverse change in the terms and conditions of employment.").  There is "no bright-line rule to determine whether a challenged employment action is sufficiently significant to serve as the basis for a claim of discrimination." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437, 446 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (alteration, citation, and internal quotation marks omitted); *Sanders v. N.Y.C. Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (same); *see also Robinson v. Dibble*, 613 F. App'x 9, 12 (2d Cir. 2015) (noting that the plaintiff's termination constituted an adverse employment action).  However, "[t]o be materially adverse[,] a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Shultz*, 867 F.3d at 303 (alteration omitted) (quoting *Galabya*, 202 F.3d at 640); *see also Parsons v. JPMorgan Chase Bank, N.A.*, No. 16-CV-0408, 2018 WL 4861379, at *7 (E.D.N.Y. Sept. 30, 2018) (quoting *Sanders*, 361 F.3d at 755).

### 1. Harassment

Plaintiff argues that "[o]ver the course of [her] career with Defendant, she was repeatedly subjected to race-based discrimination," including "several years of daily harassment," which "led to Plaintiff developing mental health issues."  (Pl. Opp'n 7.)  Plaintiff states that Albertson "picked on" Plaintiff and "spoke[] differently to her," excluded her from manager-level

meetings, and "frequently reprimanded [Plaintiff] for inconsequential issues, such as the style of shoes [that she] wore." (Pl. Decl. ¶¶ 31–33, 38.)

The harassing conduct that Plaintiff complains of — being picked on, excluded from management-level meetings, and being reprimanded for "inconsequential issues" such as the style of clothes she wore — does not constitute an adverse employment action because it did not result in a materially adverse change in the terms and conditions of employment. Though undoubtedly unpleasant, Plaintiff has not shown that she suffered "a change in working conditions [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Shultz*, 867 F.3d at 303; *see also Thomson v. Odyssey House*, 652 F. App'x 44, 46 (2d Cir. 2016) (explaining that "excessive scrutiny" is not an adverse employment action); *Chung*, 605 F. App'x at 22–23 ("[E]xclusion from seven meetings . . . cannot be said to represent a 'significant' diminution in [the plaintiff's] material job responsibilities."); *Wright v. Monroe Comm. Hosp.*, 493 F. App'x 233, 237 (2d Cir. 2012) (stating that "unpleasant comments" do not constitute an adverse employment action); *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (agreeing that "unprofessional and boorish" treatment, as well as the "dismissive attitude of . . . supervisors . . . does not amount to an adverse employment action" (alterations and citation omitted)); *Weeks v. New York State*, 273 F.3d 76, 86 (2d Cir. 2001) (stating that "criticism of an employee . . . is not an adverse employment action"); *Fraser v. MTA L.I.R.R.*, 295 F. Supp. 3d 230, 259–60 (E.D.N.Y. 2018) (explaining that "a plaintiff's exclusion from meetings generally does not rise to the level of adverse employment action" (internal quotation marks omitted)); *Kurian v. Forest Hills Hosp.*, 962 F. Supp. 2d 560 (E.D.N.Y. 2013) (finding that the plaintiff failed to allege an adverse employment action based on exclusion from staff meetings because she did not explain how the exclusion "impinged on her professional

advancement or represented a significant change in her prior responsibilities"); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[B]eing yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of . . . employment.").

## 2. Transfer

Defendant argues that "MMC's decision to eliminate one position and reassign [Plaintiff] to a different position, with the same pay and hours," is not an adverse employment action. (Def. Mem. 8.)

Plaintiff argues that her transfer from the Customer Service Department to the Accounts Receivable Department is an adverse employment action because she lost her title and significant job responsibilities, and suffered a "permanent setback [in her] career, which over time would result in fewer opportunities for pay increases, as well as other benefits." (Pl. Opp'n 7.)

An adverse employment action "might be indicated by . . . a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices." *Shultz*, 867 F.3d at 304 (quoting *Galabya*, 202 F.3d at 640). "An internal transfer can be an adverse employment action if 'accompanied by a negative change in the terms and conditions of employment,'" *Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003), or if it "results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," *Galayba*, 202 F.3d at 641; *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (finding that a transfer that did not affect wages or benefits still constituted an adverse employment action because the plaintiff showed that she was given a "less distinguished title" and "significantly diminished material responsibilities").

However, a mere "alteration of job responsibilities" or "unspecified inconvenience" resulting from a transfer is not enough. *Galabya*, 202 F.3d at 640.

Based on the facts of this case, a reasonable jury could conclude that Plaintiff suffered an adverse employment action based on her transfer. When Plaintiff returned from FMLA leave in February of 2015, Defendant transferred Plaintiff from the Customer Service Department to the Accounts Receivable Department. (Def. 56.1 ¶ 86; Pl. Resp. 56.1 ¶ 86.) Although her salary and hours remained the same, Plaintiff lost her supervisory title, and, after transfer, served as an analyst with no supervisory authority. (Def. 56.1 ¶¶ 87–88, 96, 97; Pl. Resp. 56.1 ¶¶ 87–88, 96, 97; Pl. 56.1 ¶¶ 1–2.) Plaintiff states that she had previously been on an "upward track," and the transfer was a "step back in [her] career" that made Plaintiff "seriously doubt whether [she] would be able to ever advance at MMC." (Pl. Decl. ¶ 58.) This evidence is sufficient to support a finding that Plaintiff was given a "less distinguished title," *Brady*, 531 F.3d at 134, upon transfer, especially in light of the fact that the salary for the analyst position was ordinarily lower than Plaintiff's salary in her prior position, and, as a result of the transfer, Plaintiff no longer supervised any employees. (Def. 56.1 ¶ 87; Pl. Resp. 56.1 ¶ 87; Pl. 56.1 ¶¶ 1–2.) A reasonable jury could therefore conclude that Plaintiff's transfer was an adverse employment action. *See Brady*, 531 F.3d at 134 (finding that transfer that did not affect wages or benefits constituted an adverse employment action because the plaintiff showed that she was given a "less distinguished title" and "significantly diminished material responsibilities"); *Anderson v. City of N.Y., Health and Hosp. Corp.*, No. 16-CV-1051, 2017 WL 9538862, at *7 (S.D.N.Y. Jan. 19, 2017) ("[B]eing demoted or stripped of supervisory duties or responsibilities can constitute an adverse action."), *report and recommendation adopted by* 2017 WL 3251603 (S.D.N.Y. July 31, 2017); *Pierre v. AngioDynamics, Inc.*, No. 12-CV-834, 2013 WL 1292141, at *5 (N.D.N.Y. Mar. 26, 2013)

(finding that the plaintiff sufficiently alleged a materially adverse change where position before transfer included, *inter alia*, "general management and oversight" responsibilities, and position after transfer included "carrying out tasks as directed by a superior").

### ii. Inference of discrimination

Defendant contends that Plaintiff (1) has "no direct evidence of race discrimination," and (2) does not provide any evidence of disparate treatment. (Def. Mem. 8–10.) In support, Defendant argues that the decision to eliminate Plaintiff's supervisor position was made by Alberston and Vandergast, and approved by Ferrari, and "Plaintiff admits that none of those decision-makers . . . ever said anything negative about her race or about black people." (*Id.* at 8.) Defendant also argues that although Albertson made "some isolated remarks," there is no "demonstrated nexus" between these remarks and the complained of personnel actions. (*Id.* at 9.) In addition, Defendant argues that Plaintiff cannot show disparate treatment because she "fails to identify any similarly situated employee outside of her protected class who, like her, had a position which was eliminated and was reassigned to a new position, or was treated better or differently than her." (*Id.* at 10.)

Plaintiff argues that she has established an inference of discrimination through (1) derogatory comments, and (2) evidence that she was treated "less well than her non-African-American coworkers and even subordinates." (Pl. Opp'n 8–12.)

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [a] [p]laintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med.*

*Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted);

*see also Chertkova*, 92 F.3d at 91 ("[T]here is no unbending or rigid rule about what

circumstances allow an inference of discrimination."). An inference of discrimination can be

drawn from circumstances such as "the employer's criticism of the plaintiff's performance in

ethnically degrading terms; or its invidious comments about others in the employee's protected

group; or the more favorable treatment of employees not in the protected group; or the sequence

of events leading to the plaintiff's [adverse employment action]," *Franchino v. Terence Cardinal

Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 41 (2d Cir. 2017) (citing *Littlejohn*, 795 F.3d at

312), or by showing that an employer treated an employee "less favorably than a similarly

situated employee outside his protected group," *Toussaint v. NY Dialysis Servs., Inc.*, 706 F.

App'x 44, 45 (2d Cir. 2017) (quoting *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir.

2000)). "In assessing the record to determine whether there is a genuine issue to be tried," a

court is obliged to "carefully distinguish between evidence that allows for a reasonable inference

of discrimination and evidence that gives rise to mere speculation and conjecture." *Walsh v.

N.Y.C. Hous. Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d

435, 448 (2d Cir. 1999)).

### 1. Discriminatory remarks

Plaintiff argues that she can establish an inference of discrimination because she was the

subject of "racially discriminatory comment[s]," when, for example, she was promoted and

Albertson remarked "[w]ho's this little black girl with all this power?," and heard Albertson refer

to "Latino Puerto Ricans as 'classless' and 'tacky.'" (Pl. Opp'n 10.)

In determining the probative value of a remark, courts consider four factors: "(1) who

made the remark . . . ; (2) when the remark was made in relation to the employment decision at

issue; (3) the content of the remark . . . ; and (4) the context in which the remark was made . . . ." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Remarks made by coworkers may be probative of discriminatory intent, depending on the particular circumstances under which the comments were made. *Id.*; *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) ("Remarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision." (citing *Zhang v. Barr Labs., Inc.*, No. 98-CV-5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000))).

Plaintiff identifies two racist remarks made by Albertson: (1) in March of 2003, when Plaintiff was promoted to supervisor, Matera told Plaintiff that Albertson remarked, "[w]ho's this little black girl with all the power?," (Pl. Decl. ¶ 11), and (2) on an unknown date, Plaintiff heard Albertson say that "Puerto Ricans are classless and tacky," (Pl. Dep. 286:7–11).

Albertson's first comment referring to Plaintiff and asking "[w]ho's this little black girl with all the power?," although racist, is too attenuated and therefore insufficient to establish an inference of discrimination in connection with Plaintiff's transfer or termination. *See Mesias*, 106 F. Supp. 3d at 438 ("Remarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision."). Albertson's March of 2003 derogatory comment was made more than twelve years before Plaintiff's transfer in February of 2015 and her termination in November of 2015. An invidious comment made twelve years before an adverse employment action does not support an inference of discrimination. *See id.* (finding that the "time lapse" between a discriminatory remark made a year and a half before the plaintiff's termination and another comment made more than three months before her termination "suggest[ed] that the incidents were not related"); *Sethi v. Narod*, 12 F. Supp. 3d 505, 540 (E.D.N.Y. 2014) ("District courts in this Circuit have found that a three-month lapse

between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination.") (collecting cases); *Clark v. Jewish Childcare Ass'n Inc.*, 96 F. Supp. 237, 253 (S.D.N.Y. Mar. 31, 2015) (finding that a discriminatory remark was "likely too distant in time to the adverse employment action to support an inference of discrimination, as it was made nearly four months before [the plaintiff's] termination").

Albertson's second comment, describing "Puerto Ricans as 'classless' and 'tacky,'" while offensive, also does not support an inference of discrimination. Plaintiff does not identify when the comment was made and there is no nexus between the comment and either of Plaintiff's adverse employment actions. *See Yan v. Ziba Mode Inc.*, No. 15-CV-47, 2016 WL 1276456, at *4 (S.D.N.Y. Mar. 29, 2016) (finding that the plaintiff failed to allege an inference of discrimination in part because the complaint "contain[ed] no allegations concerning the . . . temporal proximity of the comments to [the plaintiff's] termination"); *Lichwick v. Verizon*, No. 08-CV-3892, 2011 WL 4000991, at *4 (S.D.N.Y. Aug. 30, 2011) (finding no inference of discrimination where discriminatory remarks "were made at some unspecified point in the past and not in the context of [the] [p]laintiff's termination"); *Kaur v. N.Y.C. Health & Hosp. Corp.*, 688 F. Supp. 2d 317, 333 (S.D.N.Y. 2010) (holding that "[a] comment made at an undetermined time . . . cannot form the basis for an inference that [the plaintiff] was ultimately terminated due to discriminatory animus").

In addition, neither the context nor the content of Albertson's second remark is probative of discriminatory intent. *See Henry*, 616 F.3d at 149 (noting that in determining the probative value of a remark, courts consider, *inter alia*, "the content of the remark" and "the context in which the remark was made"). Plaintiff overheard Albertson's remark as Plaintiff was walking behind Albertson, who was "speaking about [another employee], talking about her being

classless and tacky, and [stating that] Puerto Ricans are classless . . . and tacky." (Pl. Dep. 286:7–11.) Albertson's remark, therefore, had nothing to do with Plaintiff's transfer or termination or with Plaintiff. *See Sethi*, 12 F. Supp. 3d at 543 ("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent."); *Lichwick*, 2011 WL 4000991, at *4 (finding no inference of discrimination where alleged discriminatory remarks were "not [made] in the context of [the] [p]laintiff's termination").[2]

## 2. Disparate treatment

Plaintiff argues that she can establish an inference of discrimination because, unlike her white colleagues, she was "excluded . . . from manager-level meetings," and Defendant "enforced rules more harshly against [Plaintiff and other] Black employees," "harassed Black employees about using the restroom,"[3] and "unfairly criticized Plaintiff's work, even when her work was identical to work performed by white employees." (Pl. Opp'n 9.)

An inference of discrimination may be established by evidence of "more favorable treatment of employees not in the protected group." *Saji*, 724 F. App'x at 17 (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). "To do so, the plaintiff must show that the comparators in question were similarly situated to the plaintiff in all material respects." *Id.* (citations and internal quotation marks omitted). "Although the question of whether two individuals were 'similarly situated' for these purposes is often a question for the jury, 'a court can properly grant summary judgment where it is clear that no reasonable jury

---

[2] Because the Court finds that the statements are insufficient to establish an inference of discrimination, the Court declines to address Defendant's argument that Albertson's derogatory statement in 2003 cannot be considered because it is hearsay. (Def. Mem. 9.)

[3] Although Plaintiff states in her opposition that Defendant "harassed Black employees about using the restroom," Plaintiff does include this fact in her 56.1 statement.

could find the similarly situated prong met.'" *Id.* (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

Plaintiff fails to establish an inference of discrimination through comparators. Plaintiff argues that she was treated "less well than her non-African-American coworkers and even subordinates" and that Cortez "checked and corrected" her work, even though she did not "check" the work of employees outside of Plaintiff's protected group. (Pl. Opp'n 9.) However, Plaintiff fails to identify any comparator and whether he or she was "similarly situated" to Plaintiff "in all material respects," *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010), *i.e.*, subject to the same workplace standards, supervised by the same manager, or any other facts that would indicate his or her similarly to Plaintiff. This failure is fatal to Plaintiff's disparate treatment claim. *See Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016) (concluding that the plaintiff had not shown disparate treatment where she "did not submit any evidence pertaining to her comparators' job duties, assignments, bonuses, or salary increases"); *Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613, 616 (2d Cir. 2012) (concluding that the plaintiff's "disparate treatment argument . . . fails because she has not identified a person with a similar level of relevant experience who received [better treatment]"); *Pierre v. Air Serv Security*, No. 14-CV-5915, 2016 WL 11396816, at *6 (E.D.N.Y. July 28, 2016) (finding that the plaintiff failed to establish a prima facie case of discrimination where he "fail[ed] to offer any evidence to support the proposition that he is either similarly situated to other employees or that he was treated any differently"), *report and recommendation adopted by* 2016 WL 5136256 (E.D.N.Y. Sept. 21, 2016)).

Plaintiff's assertion that Defendant "harassed black employees about using the restroom" and that her work was criticized even when it was "identical" to work performed by white

employees, (Pl. Opp'n 9), is insufficient to raise an inference of discrimination for the same

reason. Other than her conclusory statement, Plaintiff has presented no evidence to show that

Defendant treated white employees differently than non-white employees — she fails to identify,

for example, an employee outside of her protected group whose work was "identical" to hers but

was not criticized.[4] Plaintiff therefore cannot show an inference of discrimination through these

allegations. *See Diggs v. Niagara Mohawk Power Corp.*, 691 F. App'x 41, 44 (2d Cir. 2017)

(explaining that "speculation" as to similarly between coworkers is "insufficient to raise a

genuine issue of material fact"). Because Plaintiff has failed to establish a prima facie case of

race discrimination, the Court grants Defendant's motion for summary judgment as to Plaintiff's

section 1981 race discrimination claim.

### c. Section 1981 retaliation claim

Defendant argues that Plaintiff's section 1981 retaliation claim must be dismissed

because (1) Plaintiff has not provided any evidence that she engaged in a protected activity; and

(2) even if Plaintiff can show that she engaged in a protected activity, there is no causal

connection between that activity and any adverse employment action. (Def. Mem. 12.)

Plaintiff argues that she engaged in two protected activities, (1) when she filed an EEOC

complaint alleging race discrimination in June of 2015, and (2) when she "repeatedly

complain[ed] to Defendant, up to and including describing being in tears at the workplace." (Pl.

---

[4] Plaintiff states in her 56.1 Statement that "[s]everal white employees did not have
complaints about . . . Cortez, including Alvina and Diana." (Pl. Resp. 56.1 ¶ 132.) However,
Plaintiff's 56.1 does not reference any evidence in the record with identifying information as to
those two employees. Further, the evidence to which Plaintiff cites specifically states that
"Diana" complained to Ferrari that she "use[d] to love coming in but things have changed."
(Group Meeting Notes.) This statement does not support an inference of discrimination.

Opp'n at 14–15.)  In addition, Plaintiff argues that she can establish a causal connection between her protected activities and her transfer and termination through temporal proximity and through Plaintiff's managers' "hostil[e]" response to Plaintiff's complaints.  (*Id.* at 14–16.)

Although the statute is silent on the issue, "42 U.S.C. § 1981 encompasses claims of retaliation."  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  Section 1981 retaliation claims are assessed using the *McDonnell Douglas* burden-shifting framework.  *Id.*; *Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII and § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework" (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010))); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (same).

Under the framework, the plaintiff must first establish "a *prima facie* case of retaliation." *Russell v. N.Y.U.*, 739 F. App'x 28, 32 (2d Cir. 2018) (quoting *Hicks*, 593 F.3d at 164).  If the plaintiff sustains this initial "*de miminis*" burden, *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018), a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji*, 724 F. App'x at 14 (quoting *Hicks*, 593 F.3d at 164).  "If the defendant does so, then the burden shifts back to the plaintiff . . . [to] show that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'"  *Id.* (quoting *Ya–Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Duplan*, 888 F.3d at 625 (quoting *Vega*, 801 F.3d at 90–91); *Johnson v. Schmid*, 750 F. App'x 12, 18 (2d Cir. 2018) (applying but-for causation principles to the

plaintiff's section 1981 claim).

To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Russell*, 739 F. App'x at 32 (quoting *Hicks*, 593 F.3d at 164).

Defendant does not contest that Plaintiff engaged in a protected activity when she filed her EEOC complaint and suffered an adverse employment action when she was terminated.

### i. Protected activity

Defendant argues that neither Plaintiff's complaints to Ferrari and Vandergast in January of 2014 nor her complaints in August of 2015 constitute protected activity because both were generalized complaints that did not convey that Plaintiff believed she was being picked on because of a protected characteristic. (Def. Mem. 12–14.)

Filing either a formal or informal complaint challenging discrimination is a protected activity for purposes of retaliation claims under Title VII and therefore section 1981. *See Jagmohan v. Long Island R. Co.*, 622 F. App'x 61, 63 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013); *see also Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII & § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework" (citation omitted)). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan*, 622 F. App'x at 64–65 (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Summa*, 708 F.3d at 126 (holding that Title VII "protects employees [who] . . . make[] informal protests of discrimination, including making

complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law" (alterations in original) (quoting *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001))); *see also Bamba v. Fenton*, --- F. App'x ---, ---, 2018 WL 6331611, at *3 (2d Cir. Dec. 4, 2018) ("To qualify as a protected activity, an employee must have a good faith, reasonable belief that the challenged actions violated the law."). Complaints also cannot be so vague or "generalized that the employer could not 'reasonably have understood . . . that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (alteration and citation omitted); *see also Galdieri–Ambrosini*, 136 F.3d at 292 ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.").

### 1. January of 2014 complaints

Plaintiff's complaints to Ferrari and Vandergast about Albertson in January of 2014 do not constitute protected activity because they did not communicate that Plaintiff was complaining about conduct prohibited by the law. *See Rojas*, 660 F.3d at 108 (explaining that to constitute protected activity, employer must have reasonably been able to understand the plaintiff's complaint to be directed at conduct prohibited by Title VII). While Plaintiff complained that she was being "picked on" and being treated harshly, she never tied those actions to any protected characteristic. *See Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 774 (E.D.N.Y. 2018) (finding that the plaintiff did not establish a protected activity because he did not specify in his conversation with his employer that "any [allegedly discriminatory] comments were inappropriate or discriminatory" and therefore his employer "could not have

reasonably understood this to be a complaint about . . . discrimination"); *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) ("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity." (citation omitted)).

### 2.  July and August of 2015 complaints

Plaintiff engaged in protected activity when she complained to Ferrari in July and August of 2015 because she specifically told Ferrari that she "felt that the black employees were treated differently within the company, especially within [the Accounts Receivable Department]."  (Pl. Dep. 665:8–11, 661:20–24.)  This complaint sufficiently communicated to Ferrari that Plaintiff's grievance "was directed at conduct prohibited" by the law, *Rojas*, 660 F.3d at 108, *i.e.*, discrimination on the basis of race, and therefore constitutes protected activity.

### ii.  Causal connection

Defendant argues that because Plaintiff filed her EEOC complaint in June of 2015, after Plaintiff was transferred in February of 2015, she cannot state a retaliation claim based on her transfer.  (Def. Mem. 14.)  Defendant apparently concedes that Plaintiff can establish a causal connection between her EEOC complaint and her termination.  (*Id.* at 14–15.)

Plaintiff argues that she can establish a causal connection between her EEOC complaint and her informal complaints and her termination through temporal proximity and through the "harassment she faced" from February of 2015 to September of 2015.[5]  (Pl. Opp'n 16–17.)

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other

---

[5] Plaintiff does not identify any causal connection between her EEOC complaint or her informal complaints and her transfer.  (*See* Pl. Mem. 15–17.)

circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 307, 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Direct evidence may . . . include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in the decision-making process.'" *Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *4 (S.D.N.Y. Aug. 26, 2015) (quoting *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001)); *see also Knox v. Town of Se.*, No. 11-CV-8763, 2014 WL 1285654, at *13 (S.D.N.Y. Mar. 31, 2014) ("In determining whether a remark is probative, courts consider four factors: (i) who made the remark . . . ; (ii) when the remark was made in relation to the employment decision at issue; (iii) the content of the remark . . . ; and (iv) the context in which the remark was made . . . ."), *aff'd*, 599 F. App'x 411 (2d Cir. 2015). Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also Feingold*, 366 F.3d at 156–57 ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." (collecting cases)); *Nonnenmann v. City of New York*, 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20, 2004) ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

Plaintiff has established a sufficient causal connection between (1) her EEOC complaint

and her termination; and (2) her informal complaint and her termination. Plaintiff's EEOC complaint was filed in June of 2015, and received by Defendant on June 30, 2015. (Pl. 56.1 ¶ 3.) Plaintiff complained to Ferrari in July or August of 2015 that she "felt that the black employees were treated differently within the company, especially within [the Accounts Receivable Department]." (Pl. Dep. 661:20–24, 665:8–11.) Plaintiff's EEOC complaint was therefore received five months before her termination on November 30, 2015, and her informal complaints describing what Plaintiff believed to be race discrimination occurred approximately three to four months before her termination. This is sufficient to demonstrate a causal connection between Plaintiff's protected activities — her EEOC complaint and her informal complaints — and her termination. *See Summa*, 708 F.3d at 128 (explaining that a seven month gap between a protected activity and an adverse employment action is not "prohibitively remote"); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[A] plaintiff can indirectly establish a connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment action]." (alterations in original) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenctady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110–11 (2d Cir. 2010) ("[F]or the purposes of a prima facie case, . . . five months is not too long to find the causal relationship.").

### iii. Legitimate non-retaliatory reason

Defendant argues that Plaintiff's job abandonment is a legitimate non-retaliatory reason for her termination. (Def. Mem. 14.) In support, Defendant argues that Plaintiff was approved to take FMLA leave through October 13, 2015, but when her leave expired, she was living in Florida and did not return to work. (*Id.*) Six weeks after her FMLA leave expired, Ferrari decided to terminate Plaintiff's employment after attempting to reach Plaintiff and not being able

to contact her. (*Id.* at 14–15.)

Defendant has provided sufficient evidence to establish a non-retaliatory reason for Plaintiff's termination. Plaintiff failed to return to work in October of 2015 as scheduled. (Def. 56.1 ¶¶ 153, 161; Pl. Resp. 56.1 ¶¶ 153, 161.) Defendant tried to contact Plaintiff to determine whether she planned to return to work, but was unable to reach her. (Def. 56.1 ¶¶ 172, 173; Pl. Resp. 56.1 ¶¶ 172, 173.) Ferrari subsequently decided to terminate Plaintiff's employment for job abandonment, (Def. 56.1 ¶ 174; Pl. Resp. 56.1 ¶ 174), a legitimate non-retaliatory reason. *See Ejiogu v. Grand Manor Nursing and Rehab. Ctr.*, No. 15-CV-505, 2017 WL 1184278, at *11 (S.D.N.Y. Mar. 29, 2017) (finding job abandonment a legitimate non-discriminatory reason for termination where the plaintiff was instructed to come back to work on a certain day and received a letter instructing her to call her employer as soon as possible, but failed to do either); *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("Certainly, an employer is entitled to discharge an employee who fails to . . . appear for work without notification, even if the absences are attributable to a medical problem."); *Egbarin v. Am. Exp. Co.*, 451 F. Supp. 2d 413, 423 (D. Conn. 2006) (finding that "the defendants ha[d] met their burden of providing a legitimate, nondiscriminatory reason for terminating [the plaintiff] for job abandonment").

### iv.    Pretext

Plaintiff contends that Defendant's argument that she was terminated for job abandonment "falls flat" because "Defendant was aware of Plaintiff's mental health condition . . . [and] her complaints of race discrimination." (Pl. Opp'n 17.)

Plaintiff has failed to show that Defendant's proffered reason for her termination is pretext for retaliation. The evidence shows that in October of 2015, Plaintiff drove to Florida with her children and a friend and enrolled her children in school in Fort Lauderdale, Florida.

(Def. 56.1 ¶¶ 155, 158; Pl. Resp. 56.1 ¶¶ 155, 158.)  After Plaintiff failed to return to work on the previously agreed upon date in October of 2015, Zhou called Plaintiff several times, but was unable to reach her.  (Def. 56.1 ¶ 173; Pl. Resp. 56.1 ¶ 173.)  Ferrari then decided to terminate Plaintiff's employment.  (Def. 56.1 ¶ 175; Pl. Resp. 56.1 ¶ 175.)  This evidence is entirely consistent with Defendant's proffered reason for Plaintiff's termination — job abandonment. Even assuming that Defendant was aware of Plaintiff's "mental health condition" and her "complaints of race discrimination," (Pl. Opp'n 17), Plaintiff has not presented any evidence that such knowledge demonstrates that Defendant's decision to terminate her for abandoning her job was merely pretext or that Defendant's "desire to retaliate" was a but-for cause of her termination, *Saji*, 724 F. App'x at 14 (citation omitted).  Plaintiff testified that she was granted leave for only one month, but that Zhou was aware that Plaintiff might need six months of leave but that she "did not want to take six months," and would "try to do less."  (Pl. Dep. 745:22–25.) However, this testimony does not support pretext because Plaintiff does not dispute that she moved to Florida in October of 2015 and enrolled her children in school.  (Pl. Resp. 56.1 ¶¶ 155–58.)  Nor does Plaintiff dispute that she did not inform Defendant that she would be returning to work at a later date, or respond to Defendant's attempts to reach her in November of 2015.  (*Id.* ¶¶ 171–74; Pl. Dep. 746:6–9, 748:9–17.)

Thus, Plaintiff's conduct is consistent with Defendant's proffered reason for termination and Plaintiff has therefore failed to satisfy her burden of showing pretext.  *See Ejiogu*, 2017 WL 1184278, at *11 (finding that the defendant's proffered reason of job abandonment was not pretext because the plaintiff "received repeated notices from . . . superiors that [the plaintiff] was expected to return to work" but failed to do so); *Brown*, 488 F. Supp. 2d at 406 (finding that the defendant's proffered reason for the plaintiff's termination was not pretext because the plaintiff's

"actions provided a reasonable basis to terminate his employment" (citation omitted)); *Forde v. IBM Corp.*, No. 00-CV-6888, 2003 WL 740220, at *4 (S.D.N.Y. 2003) (finding that a reasonable jury could not find pretext where the proffered reason for termination was job abandonment and the defendant "heard no response for more than a week to its repeated efforts to establish contact [with the plaintiff]").

The Court therefore grants Defendant's motion for summary judgment as to Plaintiff's 1981 retaliation claim.

### d. FMLA retaliation claim

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation under the FMLA because she did not exercise rights protected under the statute. (Def. Mem. 15.) In addition, Defendant argues that it transferred Plaintiff for a "lawful and . . . legitimate business purpose," (*id.* at 16), and that it terminated Plaintiff's employment for job abandonment, (*id.* at 17). Defendant also argues that Plaintiff cannot establish that the proffered reasons for Plaintiff's transfer and termination are pretext because Plaintiff "admits that . . . Ferrari, the person who decided to terminate her, never said anything negative to her about her 'disability' or her need for time off." (*Id.* at 18.)

Plaintiff argues that she exercised rights protected under the FMLA even though her leave exceeded the twelve weeks provided under the statute. (Pl. Opp'n 22.) In addition, Plaintiff argues that Defendant's articulated reason for her transfer is pretext because "Plaintiff's position was neither unnecessary nor eliminated, Plaintiff's department struggled in her absence, and Plaintiff's supervisor, . . . pressed for Plaintiff not just to be reassigned, but to be terminated while out on medical leave." (*Id.* at 20.) Plaintiff also argues that the temporal proximity between her use of FMLA leave and her transfer demonstrates pretext. (*Id.* at 21.) As to her

termination, Plaintiff argues that Defendant's proffered reason is pretext because she was subjected to harassment, discrimination, and retaliation that "forced [her] out of work [and] onto FMLA leave," and then terminated.  (*Id.*)

"The FMLA gives eligible employees an 'entitlement' to twelve weeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)).  It "'creates a private right of action to seek both equitable relief and money damages against any employer . . .' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights."  *Id.* (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)).  "The Second Circuit recognizes distinct claims of interference and retaliation under the FMLA."  *Id.* at 175; *see also Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) ("FMLA claims come in at least two varieties: interference and retaliation." (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004))).  Retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer."  *Woods*, 864 F.3d at 166.

"At the summary judgment stage, retaliation claims brought pursuant to the FMLA are analyzed under the burden-shifting test set forth in *McDonnell Douglas*."  *Alexander v. The Bd. of Educ. of City of N.Y.*, 648 F. App'x 118, 121 (2d Cir. 2016).  Under that framework, a plaintiff must first establish a prima facie case of discrimination.  *Graziadio v. Culinary Institute of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).  A plaintiff's burden at this stage is "minimal."  *Holcomb*, 521 F.3d at 139 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).  If a plaintiff meets her burden at this stage, the burden shifts to the defendant-employer to "demonstrate a

legitimate, nondiscriminatory reason for its actions." *Graziadio*, 817 F.3d at 429; *see also Vega*, 801 F.3d at 84. If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to show that the defendant-employer's reason was pretext. *Graziadio*, 817 F.3d at 429.

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168; *see also Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (citing same); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012) (citing same). The plaintiff "must demonstrate that [her] taking FMLA leave constituted 'a negative factor in [the defendant's] decision to terminate' . . . her." *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 207 (D. Conn. 2012) (citing *Sista*, 445 F.3d at 176); *see also Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (holding that the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking leave pursuant to the FMLA").

Defendant does not dispute that Plaintiff was qualified for her former position or that Plaintiff's termination was an adverse employment action. Because the Court finds that Plaintiff has created an issue of fact as to whether her transfer was an adverse employment action, the Court examines whether Plaintiff exercised rights protected under the FMLA and whether she has shown an inference of discrimination as to her transfer or termination.

### i. Plaintiff exercised rights protected under the FMLA

Defendant argues that, as to Plaintiff's first FMLA leave in October of 2014, Plaintiff cannot show that she exercised rights protected under the FMLA because her FMLA leave expired in December of 2014, and "[o]nce Plaintiff's leave went beyond December [of] 2014, MMC was not obligated under the FMLA to reinstate Plaintiff to her former position."[6] (Def. Mem. 15.)

Plaintiff argues that "Defendant cannot dispute that Plaintiff satisfies the first two prongs [of the prima facie analysis], as she applied for, and Defendant granted, FMLA leave immediately before her demotion and immediately before her termination." (Pl. Mem. 19.)

In order to exercise rights protected under the FMLA, an employee must request FMLA leave due to a qualifying illness or condition. *See Wahl v. Cty. of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012); *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, 14 (D. Conn. 2018); *Hahn v. Office & Prof'l Emps. Intern'l Union, Local 153*, No. 13-CV-946, 2016 WL 4120517, at *5 (S.D.N.Y. July 22, 2016); *Nally v. New York*, No. 10-CV-1186, 2013 WL 2384252, at *16 (N.D.N.Y. May 30, 2013).

Plaintiff exercised rights protected under the FMLA when she requested and was granted leave in October of 2014. (Def. 56.1 ¶ 74; Pl. Resp. 56.1 ¶ 74.) Defendant's argument that Plaintiff did not exercise rights protected under the statute because her FMLA leave had expired, and thus her FMLA retaliation claim fails, is inapposite. An FMLA retaliation claim asks whether the Defendant was motivated by the plaintiff's taking of FMLA leave, not whether the employee was entitled to reinstatement but the defendant refused to reinstate the employee. In

---

[6] Defendant does not appear to dispute that Plaintiff exercised rights protected under the statute when she took FMLA leave in October of 2015. (*Id.* at 15–16.)

other words, an employer may not be obligated to reinstate an employee upon expiration of her FMLA leave, but that does not preclude a finding that the employer was motivated by an unlawful purpose when it transferred or terminated the employee.  *See, e.g.*, *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014) ("With interference claims, the issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA — for example, a twelve-week period of leave or reinstatement following a medical leave.  The employer's subjective intent is not at issue.  With retaliation claims, however, retaliatory or discriminatory intent is an issue."); *see also Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768–69 (5th Cir. 2001) ("The FMLA's protection against retaliation is not limited to periods in which an employee is on FMLA leave, but encompasses the employer's conduct both during and after the employee's FMLA leave."); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) ("The question of whether [the plaintiff] in fact took more than twelve weeks to recover is not relevant to the particular right he asserts in this case; that is, the right to request twelve weeks of leave pursuant to the FMLA without being fired in retaliation."); *Fleck v. WILMAC Corp.*, No. 10-CV-05562, 2011 WL 1899198, at *10 (E.D. Pa. May 19, 2011) ("Certainly, once an employee exceeds the duration of her protected leave, the employer is not obligated by FMLA to keep open the position or to reinstate the employer upon her return.  However, the focus in retaliation cases is on the subjective motive of the employer . . . . While the defendant may generally be justified in terminating [a] [p]laintiff because she remained absent at the end of her FMLA leave, this does not necessarily preclude the finding that unlawful considerations may have nevertheless played a determinative role in the particular decision at issue.").

### ii.   Inference of retaliatory intent

Defendant argues that Plaintiff cannot establish an inference of retaliatory intent because Ferrari "never said anything negative to her about her 'disability' or her need for time off."  (Def. Mem. 18.)

Plaintiff argues that she can establish an inference of retaliatory intent through the "short period of time" between (1) Plaintiff's first FMLA leave and her transfer; and (2) Plaintiff's second FMLA leave and her termination.  (Pl. Opp'n 19.)

As explained above, a causal connection in retaliation claims can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant."  *Littlejohn*, 795 F.3d at 319 (quoting *Gordon*, 232 F.3d at 117).  "Direct evidence may . . . include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in the decision-making process.'"  *Emmanuel*, 2015 WL 5036970, at *4.  Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action."  *Colon*, 983 F. Supp. 2d at 287 (citation omitted)).

Albertson's remarks during Plaintiff's first FMLA leave create an issue of fact as to whether Defendant was motivated by retaliation when it transferred Plaintiff.  During Plaintiff's leave, Albertson remarked that it was "unreal" that Plaintiff was out on leave, and told another employee that she "really [did not] want [Plaintiff] back."  (Oct. 2014 Email; Jan. 2015 Email.) In addition, when Plaintiff called Albertson to inform her that Plaintiff would be returning to work, Albertson said, "[f]rom what I understand, you no longer work for this company."  (Pl.

Dep. 567:15–20.)  Based on these facts, a reasonable juror could conclude that Defendant was motivated, at least in part, by retaliation when it eliminated Plaintiff's position and transferred her to a different department where she no longer held a supervisory title.  *Colon*, 983 F. Supp. 2d at 288 (finding that the plaintiff established an inference of retaliation where "a rational factfinder [could] infer that [the plaintiff's] discharge was actually motivated, in whole in or part by discrimination").

The temporal proximity between Plaintiff's FMLA leave and her transfer also supports an inference of retaliation.  Plaintiff was on FMLA leave from October of 2014 to December of 2014.  Though the parties do not specify on what date Plaintiff's position was eliminated and she was transferred to the Accounts Receivable Department, Plaintiff returned to work in her new position in February of 2015.  Thus, Plaintiff had been transferred at least as of February of 2015, two months after Plaintiff's FMLA leave, which supports an inference of retaliation. *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) ("The temporal proximity between [plaintiff's] protected activity in February 1998 and the allegedly adverse employment actions in March 1998 is sufficient to establish the required causal link for a prima facie case."); *Colon*, 983 F. Supp. 2d at 287 ("[T]he facts may give rise to an inference of retaliatory intent because of the timing of [the plaintiff's] notice to [the d]efendants of her intention to take FMLA leave, [was] followed very shortly by her suspension.").

Because, as explained below, Plaintiff has not shown pretext as to her termination, the Court assumes without deciding that Plaintiff has established a prima facie case of retaliation as to her termination.

### iii.   Legitimate non-retaliatory reason

Defendant argues that Plaintiff's transfer "was lawful and done for a legitimate business

purpose, [as Plaintiff] exceeded her leave and her position was ultimately eliminated." (Def. Mem. 16.)  In addition, Defendant argues that it has proffered a legitimate non-retaliatory reason for Plaintiff's termination, "since Plaintiff abandoned her position by moving to Florida and failing to return to work." (*Id.* at 17.)

Defendant eliminated Plaintiff's position, which is a legitimate non-retaliatory reason for her transfer.  Plaintiff was on FMLA leave from October of 2014 to February of 2015.  (Def. 56.1 ¶¶ 73, 75, 91; Pl. Resp. 56.1 ¶¶ 73, 75, 91.)  At some point during Plaintiff's leave, Defendant eliminated the supervisor position in the Customer Service Department because Albertson and Vandergast observed that the Department was "working well without a supervisor." (Def. 56.1 ¶ 83; Pl. Resp. 56.1 ¶ 83.)  Upon Plaintiff's return, Defendant transferred her to another position with the same salary and hours.  (Def. 56.1 ¶¶ 86–88; Pl. 56.1 Resp. 56.1 ¶¶ 86–88.)  This evidence establishes a non-retaliatory reason for Plaintiff's transfer — a legitimate business decision to eliminate Plaintiff's position.

As explained *supra*, Defendant has articulated a non-retaliatory reason for Plaintiff's termination.

### iv.   Pretext

Plaintiff argues that Defendant's articulated reason for her transfer is pretext because "Plaintiff's position was neither unnecessary nor eliminated, Plaintiff's department struggled in her absence, and Plaintiff's supervisor, . . . Albertson, pressed for Plaintiff not just to be reassigned, but to be terminated while out on medical leave." (Pl. Opp'n 20.)  Plaintiff also argues that Defendant's reason for terminating her is pretext because Defendant "forced Plaintiff out of work onto FMLA leave, then terminated her." (*Id.* at 21.)

### 1. Transfer

Plaintiff has raised a triable issue of fact as to whether Defendant's proffered reason for her transfer is pretext. First, Defendant explains that it eliminated Plaintiff's position for "budgetary reasons." (Def. 56.1 ¶ 84.) However, Defendant did not eliminate any other position in the Customer Service Department, or elsewhere in the company. The fact that Plaintiff, who was on FMLA leave, was the only employee to suffer from Defendant's "budgetary" concerns, demonstrates a weakness in Defendant's proffered reason for Plaintiff's transfer and raises a triable issue of fact as to whether Plaintiff's FMLA absence played a role in the decision. *Graziadio*, 817 F.3d at 430 ("A plaintiff may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." (citation omitted)); *DiCara v. Conn. Rivers Council*, 663 F. Supp. 2d 85, 97 (D. Conn. 2009) (finding that the plaintiff raised an issue of fact as to whether the elimination of the plaintiff's position "due to budgetary restrictions," was pretext because the plaintiff was the only employee who suffered an adverse employment action as a result of the revised budget); *cf. Douyon v. N.Y.C. Dep't of Educ.*, 665 F. App'x 54, 58 (2d Cir. 2016) (finding no pretext because "the record is clear that [the plaintiff] lost her job as a result of a pre-planned, organization-wide change"); *Shimanova v. TheraCare of N.Y., Inc.*, No. 15-CV-6250, 2017 WL 980342, at *8 (S.D.N.Y. Mar. 10, 2017) (finding no FMLA retaliation where the plaintiff's position was eliminated "as part of a larger restructuring of [her] department").

Second, while insufficient on its own, the temporal proximity between Plaintiff's FMLA leave and her transfer raises an issue of fact as to whether Defendant's non-retaliatory reason is pretext. *See Zann Kwan*, 737 F.3d at 847 ("[A] plaintiff may rely on evidence comprising her

prima facie case, including temporal proximity, together with other evidence . . . to defeat summary judgment at th[e] [pretext] stage.").

Third, remarks by Plaintiff's supervisor about her FMLA leave also raise an issue of fact as to whether Plaintiff's position was eliminated because of her FMLA leave. Albertson's remarks to Ferrari and Vandergast that it was "unreal" that Plaintiff was out on leave, (Oct. 2014 Email), and Albertson's email to another employee stating, "I really don't want [Plaintiff] back," (Jan. 2015 Email), together with (1) the fact that Plaintiff was the only individual who was affected by Defendant's "budgetary" concerns, and (2) the temporal proximity between her FMLA leave and her transfer, create an issue of fact as to whether Defendant's proffered reason for Plaintiff's transfer was pretext. The Court therefore denies Defendant's motion as to Plaintiff's FMLA retaliation claim based on Plaintiff's transfer.

### 2. Termination

Plaintiff has not established pretext as to her FMLA claim based on her termination for the same reasons that she has not shown pretext as to her section 1981 claim. Even assuming that Defendant knew about Plaintiff's medical condition, the evidence shows that after Plaintiff failed to return to work on the agreed upon date, Defendant tried to contact Plaintiff but could not reach her. (Def. 56.1 ¶ 172; Pl. 56.1 ¶ 172.) Ferrari therefore concluded that Plaintiff had abandoned her job, and decided to terminate her. (Def. 56.1 ¶ 173; Pl. 56.1 ¶ 173.) Plaintiff has not identified any "weaknesses, implausibilities, inconsistencies, or contradictions," *Zann Kwan*, 737 F.3d at 846, in Defendant's proffered reason for terminating her. Instead, the record is entirely consistent with Defendant's job abandonment determination. Plaintiff does not dispute that she moved to Florida in October of 2015 and enrolled her children in school, (Pl. Resp. 56.1 ¶¶ 155–58), or that she did not inform Defendant when she would return to work, or respond to

Defendant's attempts to reach her in November of 2015, (*id.* ¶¶ 171–74; Pl. Dep. 746:6–9, 748:9–17). Plaintiff has therefore failed to show pretext as to her termination. *Achille*, 584 F. App'x at 22–23 (concluding that the plaintiff failed to show pretext where the defendant's proffered reason for termination was "failing to return on schedule without communicating any explanation," and the plaintiff "provide[d] no evidence to counter [the defendant's] explanation"); *Colombo v. E. Irondequoit Cent. Sch.*, No. 07-CV-6270, 2010 WL 6004378, at *14 (W.D.N.Y. Dec. 17, 2010) (finding no pretext because there was "no reason to believe that the termination of [the] [p]laintiff's employment had anything to do [with the] [p]laintiff's exercise of FMLA rights"); *Brown*, 488 F. Supp. 2d at 406 (finding no pretext where the plaintiff's actions "provided a reasonable basis to terminate his employment"). The Court therefore grants Defendant's motion as to Plaintiff's FMLA retaliation claim based on Plaintiff's termination.

### e. NYCHRL claims

Defendant argues that Plaintiff's NYCHRL claims for race discrimination, retaliation and disability discrimination should be dismissed. (Def. Mem. 20–24.) In support, Defendant argues that Plaintiff's race discrimination claim should be dismissed because "Plaintiff is unable to point to a single employee outside of her protected class who was treated more favorably than she was under these same circumstances, or any circumstances for that matter." (*Id.* at 21.) As to her retaliation claim, Defendant argues that Plaintiff cannot establish a retaliation claim under the NYCHRL for the same reasons that she cannot establish a retaliation claim under section 1981. (*Id*. at 22–23.) In addition, Defendant contends that Plaintiff cannot establish a disability discrimination claim under the NYCHRL because she never requested an accommodation. (*Id.* at 23.)

Plaintiff argues that she has established claims for race discrimination, retaliation, and disability discrimination pursuant to the NYCHRL for the same reasons that she has established these claims in violation of section 1981 and the FMLA. (Pl. Opp'n 23–24.)

### i. Race discrimination

Plaintiff's race discrimination claim under the NYCHRL does not survive summary judgment. Although NYCHRL claims should be "construed liberally," *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), a "plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive," *id.* at 110. Plaintiff has not shown that she was treated "less well than other employees because of her [protected characteristic]," *id.* Instead, the evidence shows that several employees of an unidentified race were "picked on" by Cortez and Matera. (Def. 56.1 ¶ 136; Pl. Resp. 56.1 ¶ 136.) For example, Geraldine Flannigan said that the "problem we have is how we are approached [and] we are spoken to in a demeaning [manner]," an employee named Rosella stated, "I am uncomfortable on how she speaks to other people — Diana feels [the] same way," an employee named Kim stated that Cortez "constantly speaks to me like I am not intelligent," and Diana stated, "I use[d] to love coming in but things have changed." (Group Meeting Notes.) Plaintiff has therefore failed to show that she was treated "less well" because of her race, *Mihalik*, 715 F.3d at 109. Accordingly, Defendant's motion as to Plaintiff's NYCHRL race discrimination claim is granted.

### ii. Retaliation

Plaintiff's retaliation claim fails because she has not put forward sufficient evidence to "show that she took an action opposing [Defendant's] discrimination, and that, *as a result*, [Defendant] engaged in conduct that was reasonably likely to deter a person from engaging in

such action." *Mihalik*, 715 F.3d at 112 (emphasis added) (citations and internal quotation marks omitted). Although Plaintiff has put forward evidence of temporal proximity, this evidence alone is insufficient to show that Defendant undertook any action *as a result of* Plaintiff's protected activity. *Forrester v. Corizon Health, Inc.*, 752 F. App'x 62, 66 (2d Cir. 2018) ("[T]emporal proximity alone is not enough to demonstrate retaliation under the NYCHRL." (citing *Ya-Chen*, 805 F.3d at 76–77)); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 862 (S.D.N.Y. 2013) (finding that the plaintiff could not "sustain a retaliation claim under the NYCHRL [because] . . . [the plaintiff had] not offered any evidence other than temporal proximity to suggest any retaliatory animus"). Accordingly, the Court grants Defendant's motion as to this claim.

### iii. Disability discrimination

Plaintiff's NYCHRL disability discrimination claim fails because there is no evidence that Plaintiff was disabled before September of 2015, when her doctor declared her "totally disabled." (Def. 56.1 ¶ 181; Pl. Resp. 56.1 ¶ 181.) Accordingly, any disability claim arising out of Plaintiff's transfer in February of 2015 is dismissed. *See Eisner v. City of New York*, 166 F. Supp. 3d 450, 462 (S.D.N.Y. 2016) ("A prima facie case of disability discrimination under the . . . . NYCHRL requires showing . . . [that the plaintiff] was disabled within the meaning of the [statute]."); *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 74 (S.D.N.Y. 2016) ("'The standard under the NYCHRL is liberal, but not boundless.' Even under its permissive standard, a plaintiff must still establish a prima facie case." (citation omitted)).

In addition, because Plaintiff has provided no evidence that Defendant took any adverse action against her after September of 2015 *because of* her disability, Plaintiff's NYCHRL disability discrimination claim does not survive Defendant's motion. *See, e.g.*, *McDonnell v.*

*Schindler Elevator Corp.*, 618 F. App'x 697, 700 (2d Cir. 2015) (dismissing NYCHRL disability discrimination claim because "the record [was] devoid of evidence suggesting that [the plaintiff's] termination was at all motivated by disability discrimination"); *Mathew v. N. Shore–Long Island Jewish Health Sys., Inc.*, 582 F. App'x 70, 71 (2d Cir. 2014) (dismissing NYCHRL disability discrimination claim because the plaintiff had "not proffered evidence that the [defendant] terminated him 'because of' any reason other than its non-discriminatory reason").

## III. Conclusion

For the foregoing reasons, by Order dated March 31, 2019, the Court granted Defendant's motion for summary judgment as to Plaintiff's section 1981 discrimination and retaliation claims and denied Defendant's motion as to Plaintiff's FMLA retaliation claim. The Court clarifies that it is denying Defendant's motion as to Plaintiff's FMLA retaliation claim based on her transfer and granting Defendant's motion as to Plaintiff's FMLA retaliation claim based on her termination. Having considered Plaintiff's NYCHRL claims for race discrimination, retaliation, and disability discrimination, the Court grants Defendant's motion as to Plaintiff's NYCHRL claims.

Dated: May 6, 2019
      Brooklyn, New York

                             SO ORDERED:


                             _____s/ MKB_____
                             MARGO K. BRODIE
                             United States District Judge